UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GENERAL MOTORS CORP.,

      Plaintiff,

v.

ACME REFINING CO.,

      Defendant.

_____/

Case No. 06-15174

Honorable Nancy G. Edmunds


**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [14]**


    Plaintiff General Motors Corporation ("GM") filed this action alleging that Defendant Acme Refining Co. ("Acme") breached its contract with GM when it failed to pay for materials it purchased from GM. Defendant Acme filed a counterclaim alleging breach of contract and tort (negligent and innocent misrepresentation) claims because the scrap matter it purchased from GM had copper in it. This matter comes before the Court on Plaintiff GM's motion for summary judgment. For the reasons stated below, GM's motion is GRANTED.

**I.    Facts**

    GM's various manufacturing facilities generate scrap metal that GM sells to various scrap recyclers throughout the country. GM enters into written contracts to sell its scrap metal after a closed bid process. One such contract is at issue here.

In August 2005, GM invited Defendant Acme to bid on scrap generated by GM at its Dynamic Manufacturing location in Melrose Park, Illinois. Bids were solicited for the following three types of materials:

1. Ferrous transmission, torque converter, and transfer case parts;

2. Aluminum with some ferrous contamination transmission, torque converter, and transfer case parts; and

3. Aluminum transmissions, torque converter, and transfer case parts.

(Pl.'s Ex. A at 2, 3.)

Before bids are submitted, all invited bidders, including Defendant Acme, were given an opportunity to inspect the materials to be purchased from GM's various manufacturing facilities. All invited bidders receive a Pre-Bid Sheet. Defendant Acme received a Pre-Bid Sheet (Pl.'s Ex. E). That document provides, in pertinent part, that:

> Bidders are expected to have viewed the above material prior to the submission of their bid. . . . Weights are estimated and may include nonmetallic packaging and/or contamination; the actual generation may be less than or greater than this amount. . . . Material is sold "as is, where is". No downgrades or weight adjustments will be made so please bid accordingly.

(*Id.*) Acme concedes that, before submitting its bid, its representatives went to Dynamic to inspect the materials. (Def.'s Resp. at 1.)

In August 2005, Defendant Acme was the successful bidder on a contract to purchase scrap metal from GM. (Pl.'s Ex. A.) The contract's terms and conditions provide, among other things, that:

**2. DELIVERY AND RISK OF LOSS; WEIGHT OR CONTAMINATION.**

\* \* \*

2.6 Adjustments for contamination (non-metallic or incorrect material buried in the load) which were represented on the bid with no contamination must be

2

reported immediately. No adjustments will be made for contamination or weight variances without the expressed written approval of a representative from the generating facility. Accordingly, no adjustment will be made if the contamination is removed before a representative from the generating facility has an opportunity to view the material.

**3. BUYER'S ACKNOWLEDGMENTS; DISCLAIMER OR WARRANTIES.**

\* \* \*

3.3     The Scrap is sold AS IS, WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND (EXCEPT TITLE), EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE; AND SELLER HEREBY DISCLAIMS AND BUYER HEREBY WAIVES ANY OBLIGATION, LIABILITY, RIGHT, CLAIM, OR DEMAND IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, PATENT INFRINGEMENT, OR OTHERWISE WITH RESPECT THERETO. Without limiting the generality of the foregoing, Buyer acknowledges and agrees that . . . (d) Seller shall have no liability or responsibility for the condition, operation, and/or yield of the Scrap after transfer to Buyer, its agents, representatives, and/or contractors.

\* \* \*

**13.     ENTIRE AGREEMENT.**

This Agreement constitutes the entire agreement between the parties and supersedes any prior understandings between the parties, oral and written, with respect to the subject matter hereof and may only be amended, modified or supplemented by a written amendment executed by authorized representatives of Seller and Buyer. Failure by Seller or Buyer to enforce any term, provision or condition hereof, or to exercise any of its rights hereunder, shall not be construed as thereafter waiving such Terms, provisions, conditions or rights. In no event shall any course of dealing, custom or usage of trade modify, alter or supplement any of these terms and conditions of this Agreement.

(Pl.'s Ex. B, GM GPSC Metallic Scrap Team Terms and Conditions of Sale.)

In October 2005, Defendant Acme began pulling its first scrap loads from the Dynamic Manufacturing site. After Acme brought the scrap material back to its facility, it informed GM that it believed the scrap to be of a substandard quality. In an October 7, 2005 email, Acme's Michael Pope informed GM that he was out of the office for the last few days as

3

Acme started to pull the scrap loads out of Dynamic Manufacturing in Illinois. After reviewing the material that morning, he had the following complaints: that "none of this material is clean auto cast that our bid was based upon. After looking deeper I noticed that some of the material had copper on the inside. Also there is non metalics on some of the scrap itself. Another issue is oil build up in puddle form on the scrap housings." (Def.'s Ex. C, 10/7/05 email.) Acme's Pope informed GM that (1) "right now in today's market, this material should have been referred to as heavy melt steel, not auto cast"; (2) "Market values today for this material are approximately $110.00 per gross ton"; (3) Acme would not pull any more loads from Dynamic until these issues were resolved; and (4) requested "any chemical specifications on the converter covers" to help Acme in marketing the material. (*Id.*)

GM's Erick Niessen responded that same day, informing Pope that there would be no price adjustment:

> The bid formula used allowed you to use a modifier to the current market value. You were asked to base your bid on a specific market and then modify it by either adding to it or subtracting from it as you saw fit in order for your final price to best reflect what you felt the scrap was worth. As a result, no price adjustment will be made.
>
> The bid clearly instructed participants to "contact the plant for complete item description, service, container, loading, security, and shipping requirements." It further instructed that "Bidders are expected to have viewed the above material prior to the submission of their bid" and "Weights are estimated and may include nonmetalic packaging and/or contamination; the actual generation may be less than or greater than this amount" and "Material is sold 'as is, where is.'" These points are reiterated in the GM GPSC Metallic Scrap Team Terms and Conditions of Sale. The material you were contracted to pick up has not changed from the time you looked at it so it should not be an issue now. Any issues you have with the material condition and contamination should be worked out directly with the plant while you continue to service them. You have the right to terminate the agreement if you [sic] without penalty by giving us a 30 day written notice prior to stopping the pick up of the scrap at the plant. You must

continue to pick up the scrap from the plant during that 30 day timeframe; immediately stopping service is not prudent nor acceptable and has repercussions. Refusing to pick up the scrap constitutes a breach of contract and will result in GM terminating all three of the contracts effective in 30 days per section 9 of the Terms and Conditions of Sale as well as dropping you from our master bid list unless you resume service immediately.

We need to know what you intend to do so we do not shut down the plant. Please confirm your intent by 12:00 Noon on Monday 10/10/2005.

(Def.'s Ex. D, 10/07/05 email.)

Acme responded on October 7, 2005, informing GM that Acme will work with Dynamic on any contamination issues. "We at Acme value our relationship with [G]eneral [M]otors and in no way want that damaged. We want to continue to service Dynamic [M]fg. But their [sic] must be an adjustment to the formula for material received as well as future material. We will begin on Monday to pick up the material. We must come to some type of agreement as to price on this type of material. As copper is not just a contaminate it is a poison." (Def.'s Ex. E, 10/07/05 email.)

On October 11, 2005, GM replied that "no price adjustment will be authorized." (Def.'s Ex. F, 10/11/05 email.) Because Acme was still refusing to pick up material from Dynamic, GM notified Acme that it was terminating their contract, "effective in 30 days as stated in section 9 of GM GPSC Metallic Scrap Team Terms and Conditions of Sale." (*Id.*) GM replaced Acme with its number two bidder on the contract. That number two bidder maintained the contract for 14 months and re-bid the contract again in 2007.

After Acme refused to pay for the scrap material it had removed from Dynamic Manufacturing in October 2005, GM filed this lawsuit seeking payment of the $112,020.71 outstanding balance. Acme filed a counterclaim, alleging breach of contract and negligent and innocent misrepresentation claims against GM. This matter is now before the Court

on GM's motion for summary judgment on the breach of contract claim in its complaint and on each count in Acme's counterclaim.

## II.   Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party.  *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.   Analysis

## A. Breach of Contract

Both GM and Acme argue that the other breached their scrap material contract. GM argues that Acme accepted the contracted-for scrap material, unsuccessfully sought to modify that contract by asking for a price adjustment, and subsequently breached the contract when it refused to pick up additional scrap materials from Dynamic Manufacturing and refused to pay for the scrap materials it did pick up. GM seeks damages in the amount owed under the contract for goods accepted by Acme.

Acme, on the other hand, argues that because it rejected rather than accepted the subject scrap materials as non-conforming, it is entitled to set-off any amounts owing under the contract with the actual fair market value of the non-conforming goods. Alternatively, Acme argues that it revoked its acceptance of the scrap materials as permitted under Michigan's version of the Uniform Commercial Code, Mich. Comp. Laws § 440-2608. Finally, Acme argues that the accepted scrap materials were not as warranted and thus GM is liable to it for damages. This Court rejects each of Acme's arguments.

First, viewing the evidence in the light most favorable to Acme, there was no rejection of the subject scrap materials within a reasonable time after Acme went to Dynamic Manufacturing and removed over 850,000 gross tons of scrap material from that GM manufacturing facility. In each of its October 2005 emails, Acme did not notify GM that it was rejecting the scrap materials. *See* Mich. Comp. Laws § 440.2602(1) ("Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."). Rather, in each email, Acme sought to modify or adjust the price quoted in its contract with GM. (Def.'s Exs. C and E.) There was no rejection of the goods prior to GM's termination of the contract. Because there was no

rejection, Acme is not entitled to a set-off as provided under Michigan's U.C.C. § 44.2604.[1]

Moreover, a buyer who accepts goods "must pay at the contract rate for any goods accepted."  Mich. Comp. Laws § 440.2607(1).

Second, similar to the rejection, Acme never notified GM that it was revoking its acceptance of the subject scrap materials.  Section 2608 of Michigan's U.C.C. provides that:

> Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of goods which is not caused by their own defects.  It is not effective until the buyer notifies the seller of it.

Mich. Comp. Laws § 440.2608(2).  Because Acme never notified GM that it was revoking its acceptance, it is not entitled to invoke the provisions of § 440.2608.[2]

Finally, because the GM/Acme contract expressly provided that the "scrap is sold AS IS, WITH ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND (EXCEPT TITLE), EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY

---

[1]Section 440.2604 provides that:

> if the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement as provided in the preceding section.  Such action is not acceptance or conversion.

Mich. Comp. Laws § 440.2604.

[2]Even if Acme had notified GM that it was revoking its acceptance of the scrap materials, its revocation claim would fail because the goods were sold "as is" and without any warranties.  As observed in *Davis v. LaFontaine Motors, Inc.*, 719 N.W.2d 890 (Mich. Ct. App. 2006), "if the only relevant language in the agreement as to quality has been effectively declaimed, no nonconformity in the goods sufficient for revocation can exist." *Id.* at 898 (internal quotes and citations omitted).

OF MERCHANTABILITY OR FITNESS FOR PURPOSE," Acme is not entitled to the breach of warranty damages addressed in § 440.2714.

At the time of bidding, Acme received a bid sheet that expressly stated that "weights are estimated and may include nonmetallic packaging and/or contaminants. . . . Material is sold 'as is, where is.' No downgrades or weight adjustments will be made so please bid accordingly." (Pl.'s Ex. E.) On the GM GPSC Metallic Scrap Team Terms and Conditions of Sale, it is expressly stated that "[t]he Scrap is sold AS IS . . . ." Acme accepted the scrap material, and failed to notify GM that it was revoking its acceptance before GM properly terminated the contract because Acme refused to pick up scrap materials from Dynamic Manufacturing pursuant to the terms of the contract. There is no genuine issue of material fact whether Acme or GM breached their scrap material contract. Acme breached and GM did not. Accordingly, GM's motion for summary judgment is granted as to its breach of contract claim against Acme and as to Acme's breach of contract claim against GM. The Court now addresses the tort claims alleged in Acme's counterclaim.

## B. Acme's Tort Claims

In its counterclaim, Acme asserted claims of negligent and innocent misrepresentation, alleging that (1) GM falsely and/or fraudulently represented to Acme that the scrap materials made available to it for pre-bid inspection were substantially similar in all respects to the scrap materials referenced in the GM/Acme contract; (2) Acme justifiably and reasonably relied on GM's representations in formulating its bid; and (3) suffered damages as a result. In its motion for summary judgment, GM argued that these tort claims are barred under Michigan law by the economic loss doctrine. In response, Acme asserts for the first time a claim that it was fraudulently induced to enter into the scrap

material contract by GM's misrepresentations about the quality of the goods it sold to Acme. As support, Acme relies on *Huron Tool and Engineering Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 543 (Mich. Ct. App. 1995).

Acme's reliance on *Huron Tool* is misplaced for several reasons. First, as observed in that decision, "[t]he economic loss doctrine provides that where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only 'economic' losses." *Id.* (internal quotes and citation omitted). The *Huron Tool* court next observed that "courts generally have distinguished fraud in the inducement as the only kind of fraud claim not barred by the economic loss doctrine." *Id.* at 544. Thus, Acme's claims of negligent and innocent misrepresentation are barred by the economic loss doctrine. Further examination of the *Huron Tool* decision reveals that Acme's fraud-in-the-inducement claim is likewise barred.

In *Huron Tool*, the Michigan Court of Appeals reasoned that such an exception to the economic loss doctrine was justified because it "addresses a situation where the claim is that one party was tricked into contracting." *Id.* It distinguished between fraudulent behavior that induces one party to enter into a contract and a dishonest party's misrepresentations regarding the quality or character of the goods that are the subject of the contract, observing that the former situation constitutes an exception to the economic loss doctrine whereas the latter does not.

> Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely -- which normally would constitute grounds for invoking the economic loss doctrine -- but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation

by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods.

*Huron Tool*, 532 N.W.2d at 545.

The only misrepresentations that Acme alleges were made by GM concern the quality or character of the scrap materials it sold to Acme. Thus, these facts fit those described in *Huron Tool* as falling outside the sole exception to the economic loss doctrine. The facts presented here show that Acme, a sophisticated party, submitted its bid despite express disclosure by GM at the pre-bid stage that any goods sold would be "as is, where is" and that no downgrades or weight adjustments would be made. (Pl.'s Ex. E.) By submitting its bid, Acme accepted those terms and conditions. Accordingly, GM's motion for summary judgment is granted as to Acme's tort claims.

## IV. Conclusion

For the above-stated reasons, GM's motion for summary judgment is GRANTED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: September 7, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 7, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager